## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**Duluth, Winnipeg and Pacific**
**Railway Company,**

                    **Plaintiff,**

**v.**                                             **ORDER**
                                                   **Civil File No. 05-2758 (MJD/RLE)**

**City of Orr; Doran Klakoski, in his**
**capacity as mayor of Orr; Ross**
**Litman, in his official capacity**
**as Sheriff of St. Louis County; and**
**State of Minnesota,**

                    **Defendants.**

---

Diane P. Gerth, Glenn J. Olander-Quamme, JoAnn C. Toth, Spence Ricke Sweeney & Gernes, Counsel for Plaintiff.

Donald J. Mueting, Office of the Minnesota Attorney General, Counsel for Defendants City of Orr, State of Minnesota, and Doran Klakoski.

Dale O. Harris, St. Louis County Attorney, Counsel for Defendant Ross Litman.

---

## I.    INTRODUCTION

This declaratory judgment action arises out of a dispute regarding

Defendants' attempt to regulate the train speed that Plaintiff's trains can travel

through the city of Orr, Minnesota.  Before the Court are Plaintiff's Motion for

Summary Judgment [Doc. No. 29] and Defendant Ross Litman's Motion for

Summary Judgment [Doc. No. 42].  Plaintiff Duluth Winnipeg and Pacific Railway

1

("DWP") seeks summary judgment on all counts in the complaint and dismissal of the case with prejudice, and Defendant Litman seeks to be dismissed as a party in this case.  Oral argument was heard on February 2, 2007.

## II.    FACTUAL BACKGROUND

There are no disputes about the basic facts of this case.  Orr is a small city located on the shores of Pelican Lake in St. Louis County in northeastern Minnesota.  DWP owns a Class 4 railroad track that runs through Orr.[1]  DWP runs about sixteen trains a day through Orr, evenly divided between north and southbound traffic.  The trains carry many types of cargo, including hazardous materials.

The tracks that run through Orr are 132 to 134 pound rail that are maintained at or above Federal Railroad Administration ("FRA") standards.  The tracks are also inspected on schedules that exceed FRA standards.  Within Orr, there is one at-grade crossing in the downtown area, and a separate crossing about half a mile north of the center of town.  The crossing in town is protected by advance warning signs, flashing lights, bells, and gates that are standard and comply with the Minnesota Manual on Uniform Traffic Control Devices.  The area of the crossing is relatively flat and straight.

---

[1] Railroad tracks are divided into classes depending upon the maximum speeds that trains are allowed to run on the tracks.

In about December 2003, after completing improvements to its track, DWP increased its maximum authorized speed from about 49 miles an hour to up to 60 miles an hour.  Because of the presence of a dangerous curve north of Orr, train speeds through Orr are slightly lower.

In response to the increased train speed, the Minnesota Legislature passed a bill to limit train speed in Orr to 30 miles per hour.  Governor Tim Pawlenty signed the bill into law on July 14, 2005.  The special law provides the following:

> Section 101 [MAXIMUM TRAIN SPEED IN CITY OF ORR.] In order to eliminate or reduce local safety hazards, a railway corporation may not permit a train to be operated at a speed in excess of 30 miles per hour while any portion of the engine or train is within the limits of the City of Orr in St. Louis County.
>
> [EFFECTIVE DATE; LOCAL APPROVAL.] This Section is effective the day after the governing body of the City of Orr and its chief clerical officer comply with Minnesota Statutes, § 645.021, Subdivisions 2 and 3.

Minn. Special Law 2005, H.F. No. 140 Sec. 101.  On August 8, 2005, the Council unanimously passed a resolution adopting the 30 mile per hour speed limit. (Gerth Aff. Ex. B.)  The law went into effect on August 22, 2005.

Although neither Orr nor St. Louis County has issued any citations for violations of the special law, the St. Louis County Sheriff's Office indicated to DWP that it was prepared to issue citations if DWP did not comply with the new

lower speed limit.  The Sheriff's office has now declared that it will not issue

citations unless and until this Court declares the special law valid.

## III.   DISCUSSION

### A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. CIF.

P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986).  The party

seeking summary judgment bears the burden of showing that there is no disputed

issue of material fact.  <u>Id.</u> at 323.  Summary judgment must be granted when the

opposing party fails to make a showing that supports the existence of an element

essential to the case and on which the opposing party bears the burden of proof at

trial.  <u>Id.</u> at 332-33.

### B.   <u>Plaintiff's Motion for Summary Judgment</u>

DWP seeks summary judgment under three different theories: (1) the

special law is preempted by the Federal Railway Safety Act; (2) the special law is

preempted by the Interstate Commerce Commission Termination Act; and (3) the

special law is an undue burden on interstate commerce that violates the

Commerce Clause of the United States Constitution.

1.    **Federal Railway Safety Act**

"Where a state law conflicts with, or frustrates, federal law, the former must give way."  <u>CXS Transp., Inc. v. Easterwood</u>, 507 U.S. 658, 663 (1993) (citing, <u>inter alia</u>, U.S. Const. art. VI).  The Federal Railway Safety Act ("FRSA") was passed in 1970 to "promote safety in every area of rail operations."  49 U.S.C. § 20101.  The FRSA gives the Secretary of Transportation the authority to make regulations and issue orders "for every area of railroad safety."  49 U.S.C. § 20103(a).  The FRSA includes the following provision:

> National uniformity of regulation
>
> Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.  A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.  A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—
>> (1) is necessary to eliminate or reduce an essentially local safety or security hazard;
>> (2) is not incompatible with a law, regulation, or order of the United States Government; and
>> (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

The Secretary delegated his power to the Federal Railroad Administration ("FRA"), which enacted regulations regarding track safety standards authorizing freight train speeds of up to 60 miles per hour on Class 4 tracks.  49 C.F.R. § 213.9.  The Supreme Court has held that 49 C.F.R. § 213.9 "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings."  Easterwood, 507 U.S. at 675.  In Easterwood, the Court held that since the common law of negligence was not designed to address any essentially local safety hazard, federal law pre-empted a common law claim that a train traveling within federal speed limits was negligently proceeding too fast for conditions.  Id. at 675-76.  The Court also held, however, that federal law did not pre-empt a state common law negligence claim based on a railroad's duty to maintain safe crossing warnings.  Id. at 673.  Thus, although coverage is broad, not every subject touching on safe railroad operations is pre-empted.

## 2.    Savings Clause Provisions

There is a "presumption against pre-emption," and courts must avoid encroaching upon state authority when addressing federal supremacy issues.  Id. at 663-64, 668.  The Court must consider 49 U.S.C. § 20106's savings clause.  The three pronged savings clause allows states to pass laws that would normally be preempted.  All three prongs must be satisfied for the savings clause to apply.

Therefore, to prevail Defendants must demonstrate that the special law is necessary to eliminate or reduce an essentially local safety hazard; is not incompatible with another federal law or regulation; and does not unreasonably burden interstate commerce.  49 U.S.C. § 20106.

### a.    Essentially Local Safety Hazard

Plaintiffs' Expert, Archie Burnham, Jr., an expert in traffic engineering and safety, asserts that five factors combine together in Orr to create an essentially local safety hazard under federal law: (1) the track's proximity to Pelican Lake which could cause the lake to become contaminated with spillage from derailments; (2) the swampy soil that the track is built upon could cause a "continuing problem" for restructuring and rebuilding the track in the future; (3) the location of propane tanks close to the tracks, with the potential for an explosion; (4) the location of churches and other businesses near the tracks, with some of these buildings being within 67 to 278 feet from the tracks; and (5) the extreme seasonal temperature changes in that part of Minnesota which limit the possibilities for alternatives such as relocation of the tracks.  (Burnham Dep. at 44-62; Guthrie Aff. Ex. C.)  According to Burnham, although none of these circumstances, alone, constitutes a hazard, it is the unique circumstance of all five of these factors occurring in one place that makes this an essentially local hazard.

"[O]nly conditions that the FRA has not contemplated in promulgating maximum train speed limits can qualify as essentially local safety hazards." In the Matter of the Speed Limit for the Union Pac. R.R. Through the City of Shakopee, 610 N.W.2d 677, 685 (Minn. Ct. App. 2000).  Conditions that exist at many intersections are not unique and cannot constitute essentially local safety hazards. Id. (citation omitted).

The essentially local hazard prong was satisfied in only one Minnesota case. In Shakopee, the court found that the unique situation presented by these factors created an essentially local hazard: (1) the rail line ran through the center of a city street with parallel lanes of automobile traffic on both sides; (2) the track had ten grade crossings within one mile with various types and levels of protection and warnings, some of which were concededly the least effective types of warnings; (3) none of the crossing warnings were the most effective warning devices available; (4) there was a high volume of pedestrian and vehicular traffic present near the track; (5) trains ran within eight and one-half to nine feet of automobile lanes; and (6) this was the only place in Minnesota exhibiting these unique features.  Id. at 686.

DWP argues that the conditions in Orr do not constitute an essentially local safety hazard and that there is no evidence that a reduction of train speed is necessary to reduce or eliminate any hazard.  DWP asserts that there is nothing

unique about the frequency of the trains that go through Orr or about the cargo that the trains carry; that the location of Orr's churches, schools, and other community buildings are "no different than the situation found in hundreds, if not thousands, of railroad towns across the country;" that Orr's climatic and soil conditions are similar to those in other northern towns; that the single grade crossing has safe warning devices; that the maintenance and inspection of the tracks in Orr meets or exceeds federal standards; and that the speeds that trains travel through Orr are not unusual.  (Pl. Mem. Supp. Mot. Summ. J. at 14.)

DWP further argues that federal courts have "consistently held" that conditions more unique and dangerous than those presented in this case have failed to satisfy the essentially local safety hazard prong of the savings clause, and thus the situation in Orr does not satisfy this prong of the clause.  (Pl. Mem. Supp. Mot. Summ. J. at 15 (citing Union Pacific v. California Pub. Util. Comm'n, 346 F.3d 851, 861-62 (9th Cir. 2003) (holding that combination of highest steep grade/curve combination in the state, high derailment rate, and risk of large scale water contamination if a toxic spill occurred not essentially local safety hazard because risks could be addressed by national standards); CSX Transp., Inc. v. Williams, 406 F.3d 667, 672 (D.C. Cir. 2005) (holding that vulnerability of trains carrying toxic waste through the United States capital was not an essentially local

safety hazard that could not be adequately addressed by national standards, even though the standards were not currently doing so)).

Defendants argue that reduced speeds will reduce the safety hazard in Orr. Burnham testified that with "higher speeds, you're increasing the probability of a derailment," and that hazards could be reduced by limiting train speeds from 60 mph to 30 mph.  (Burnham Dep. at 126, 129.)

Defendants also note that DWP's expert, Leif Thorson, admitted that extreme cold temperatures of 30 to 40 degrees below zero, such as are common in Orr in the winter, can be a contributing factor to train derailments, and that he would expect slow orders on extremely cold days.  A slow order is "a device that railroads use to control the speed of trains for temporary restrictions that . . . may develop during the course of normal activities or abnormal activities . . . . [such as] temperature or weather-related conditions."  (Thorson Dep. at 33.)

The Court finds that the situation in Orr presents an essentially local safety hazard.  Although many towns have propane tanks and buildings close to railroad tracks, and thousands of miles of track runs through cold climates, the Court finds that the convergence of these factors in once place coupled with the swampy soil and Pelican Lake in Orr make this a unique situation.  DWP seems to agree, at least partially, since it already limits train speed on the curve outside of Orr, and slow orders are already issued on extremely cold days.  Moreover, there was

10

already a derailment at this site that resulted in damage to a propane tank.

(Burnham Dep. at 144-45.)  Defendants' expert opined that an explosion was only

avoided in that incident because there "was little momentum at the end of the

crash."  (Id. at 145.)

Thus, the Court concludes that the situation in Orr is an essentially local

safety hazard.  Defendants have satisfied the first prong of the savings clause.

### b.  Not Incompatible with a Law, Regulation, or Order of the United States Government

DWP argues that the special law is incompatible with federal laws,

regulations, and orders.  Specifically, DWP argues that since federal regulations

cover the subject matter, the special law is at odds with federal law.  However, as

a plain reading of § 20106 reveals, and as the Shakopee court stated, the savings

clause makes it obvious that local regulation of train speed is not preempted in

certain situations.  Shakopee, 610 N.W.2d at 686.

The special law is not incompatible with federal regulations because the

regulations at issue only set maximum speeds for certain types of track.  Id.  They

do not state that lower speeds are illegal, although the FRA asserts that consistent

faster speeds are the safest and most desirable speeds.  See 63 Fed. Reg. 33992,

33999 (June 22, 1998).  Thus, the special law is not incompatible with any law,

regulation, or order of the United States Government.

11

### c.  **Unreasonable Burden on Interstate Commerce**

DWP argues that the special law is an unreasonable burden on interstate

commerce.  For support, DWP cites the Federal Register wherein the FRA states

that railroads and public safety are best served by allowing railroads to set their

speeds within the speed limits for certain track grades as established by the FRA.

Id.  In addition, one of DWP's experts opines that the extra fuel costs railroad

companies would incur by slowing down through Orr could amount to almost

$100,000 a year.  (Guthrie Aff. ¶ 12.)  DWP further argues that reduced speeds

hurt railroads because they can never make up for the time they lose, and that the

effects of allowing the special law to stand would be more far-reaching than just

the effects on the lines that run through Orr.  Rather, DWP asserts that if the

special law is not struck down, other communities all over Minnesota will try to

pass similar speed reduction schemes, and the effects on interstate commerce will

be enormous.  DWP cites CSX Transp., Inc. v. Williams for the proposition that it

is appropriate to consider such practical matters as the cumulative impact actions

would have if other states were to adopt laws similar to the laws before any given

court.  In Williams, the court considered the cumulative effect that would result if

several different cities and towns prohibited the shipment of hazardous materials

on the rail lines in their jurisdictions.  406 F.3d at 673.  The court concluded that

"[i]t would not take many similar bans to wreak havoc with the national system of hazardous materials shipment." Id. (bracket in original) (citation omitted).

Defendants respond that the far-reaching doomsday scenarios cited by DWP are inappropriate considerations. The Shakopee court opined that the cumulative result of several local speed regulations was too speculative for it to consider. 610 N.W.2d at 686 (opining that although "the potential cumulative effect of relatively insignificant burdens on interstate commerce may be enough to invalidate a state regulation," applying that rule to all essentially local safety hazards that satisfy the savings clause would render the clause a nullity).

Defendants distinguish Williams because the D.C. Circuit noted that at the time it was considering Williams, a bill was working its way through the California legislature that would have banned the shipment of hazardous products within three miles of any city in California with a population of over 50,000 people. See 406 F.3d at 673. Thus, when the Williams court considered the cumulative effects of similar regulations around the country, it was not merely speculating, but was facing a very real trend. However, the Williams court did not state that it only considered these matters because of the pending California legislation. The court also relied on Southern Pac. Co. v. Arizona, 325 U.S. 761, 774-75 (1945), which reasoned that "[i]f one state may regulate train lengths, so may all the others, and they need not prescribe the same maximum limitation.

13

The practical effect of such regulation is . . . . [a] serious impediment to the free

flow of commerce by the local regulation . . . and the practical necessity that such

regulation, if any, must be prescribed by a single body having a nation-wide

authority."

DWP admits that a thirty mile an hour speed limit though Orr itself will not

delay trains anymore than five minutes.  (Payton Dep. at 66.)  This is less than the

eleven to thirteen minute delays approved in Shakopee.  See 610 N.W.2d at 686.

The special law does not create an unreasonable burden on interstate

commerce.  Trains already slow down around the curve outside of town and have

the choice of maintaining that speed through Orr.  In addition, slow orders

already necessitate slow-downs on extremely cold days.  Moreover, the special

law can be distinguished from laws that require trains to completely bypass

certain locations or that regulate train length.  No train would have to change its

route or change its configuration to travel through Orr.  The trains merely need to

slow down, something they do already when approaching the curve right outside

of town.

### d. Impermissible Delegation

DWP also argues that the special law represents an improper delegation of

state power to the City of Orr.  49 U.S.C. § 20106 states that the savings clause

applies to state laws.  DWP argues that in this case, the state impermissibly

14

delegated that power to the city.  In addition, DWP asserts that the state is not

allowed to delegate its authority by letting the actions of a city trigger the

applicability of the law.  For example, in <u>Johnson v. Southern Ry. Co.</u>, the court

struck down a city ordinance regulating the speed of trains within its borders.

654 F. Supp. 121, 124 (W.D.N.C. 1987).  The ordinance at issue was promulgated

pursuant to a state statute allowing municipalities to set speed limits for trains

passing through them.  <u>Id.</u> at 122.  The court held that although the state had the

power to set speed limits for trains under the savings clause, and although states

usually have the right to delegate their power to municipalities through enabling

statutes, states have no right to delegate powers given to them by Congress.  <u>Id.</u>

DWP argues that this is exactly what Orr did, and it is impermissible.

In addition, DWP asserts that had Orr wanted this special law, there was a

way for it to get it without having an impermissible delegation – Orr could have

filed a petition with the Minnesota Department of Transportation just like the city

of Shakopee did in <u>Shakopee</u>.

The special law does not represent an impermissible delegation of state

power.  The law was passed by the Minnesota Legislature and was signed into law

by the Governor.  In addition, the special law does not represent delegation to the

city of Orr.  Under the Minnesota Constitution and Minnesota statute, special laws

must be approved by the local governments they affect.

> Every law which upon its effective date applies to a single local government unit . . . is a special law . . . . The legislature may enact special laws relating to local government units, but a special law, unless otherwise provided by general law, shall become effective only after its approval by the affected unit expressed through the voters or the governing body and by such majority as the legislature may direct.

Minn. Const. art. 12, § 2.  The need for local approval of special laws is codified at Minn. Stat. § 645.021, subd. 2.

The fact that Orr could have sought regulation through MNDOT does not render the special law invalid.  The special law is clearly the result of state action, and therefore falls squarely within the ambit of § 20106.  Thus, DWP's argument is without merit.

Accordingly, the special law does not violate the FRSA because it satisfies all three prongs of § 20106's savings clause.

### 3. Interstate Commerce Commission Termination Act of 1996 ("ICCTA")

The Interstate Commerce Commission Termination Act of 1996 abolished the Interstate Commerce Commission and established the Surface Transportation Board ("STB") under the Department of Transportation, and gave the Board jurisdiction over transportation that is exclusively by rail.  The Board's jurisdiction is set forth below:

(b) The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(9).  For purposes of the Act, "transportation" is defined as:

(A)     a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B)     services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102.

DWP argues that the special law is an attempt to regulate all rail operations.  DWP cites CSX Transp., Inc. – Pet. for Decl. Order, STB Fin. Doc. No. 34662, 2005 WL 584026, at *8 (S.T.B. Mar. 14, 2005), for the proposition that state and local authorities cannot take any action that would "have the effect of foreclosing or unduly restricting a railroad's ability to conduct its operations or otherwise unreasonably burden interstate commerce."  However, that case also

17

acknowledges that "although a literal reading of section 10501(b) might suggest that it supersedes other federal law, the Board and the courts have rejected such an interpretation . . . . Instead the Board and the courts have harmonized section 10501(b) with federal statues, including FRSA." Id. (citation omitted).

"ICCTA and the FRSA must be construed in pari materia; that the Federal Railroad Administration under the FRSA exercises primary authority over rail safety; and therefore that the FRSA, not ICCTA, determines whether a state law relating to rail safety is preempted." Iowa, Chicago & E. R.R. Corp. v. Washington Cty., 384 F.3d 557, 560 (8th Cir. 2004) (quoting Tyrrell v. Norfolk S. Ry., 248 F.3d 517, 522 (6th Cir. 2001)).

Since the special law was passed to address safety issues, the "safety body of law" controls.  Preserving issues for analysis under the FRSA accomplishes the goal of keeping both Acts viable.  Thus, the ICCTA has no bearing on this case.

### 4. Commerce Clause

The Commerce Clause to the Constitution provides that Congress has the authority to "regulate Commerce with foreign Nations and among the several States." U.S. Const. Art. I § 8.  The Commerce Clause will prevent state regulation if the regulation discriminates against interstate commerce, or if the regulation creates a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S.

383, 390 (1994) (citations omitted).  Regulations may not "materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern."  Southern Pac. Co. v. Arizona, 325 U.S. 761, 770 (1945).

DWP argues that the special law interferes with the uniformity required in railway regulation, and thus violates the Commerce Clause.  DWP also argues that the special law "runs afoul of the intentional regulatory void created by Congress[:] . . . the dormant commerce clause that restricts the state's power to regulate even in the absence of congressional action in a particular area."  (Pl. Mem. Supp. Mot. Summ. J. at 32.)  In support of this argument, DWP argues that states and local units of government may not interfere with interstate commerce to "advance their own local agendas."  (Id.)  DWP cites two cases in support of its dormant commerce clause argument:  Kassel v. Consolidated Freightways Corp., 450 U.S. 662 (1981), and City of Philadelphia v. New Jersey, 437 U.S. 617 (1978).

In Kassel, the Supreme Court found that an Iowa statute prohibiting semi trailers longer than 55 feet from traveling within the state violated the Commerce Clause.  450 U. S. at 678-79.  A shipper that normally used 65 foot "double trailers" and needed to move goods through Iowa from another state had limited options: it could use shorter trucks, it could detach longer "double" trucks and

19

shuttle each through Iowa separately, or it could divert its 65 foot trucks around the state.  Id. at 667.  The Court reasoned that since Iowa was seemingly not motivated by safety concerns, it enacted the limitation only to "limit the use of its highways by deflecting some through traffic."  Id. at 677.  The Court found that in the absence of a stated countervailing safety interest, the statute violated the Commerce Clause.  Id. at 678-79.

In City of Philadelphia, the Court found that a New Jersey statute prohibiting the importation of any out-of-state solid or liquid waste violated the Commerce Clause.  437 U.S. at 629.  This statute had an immediate and detrimental effect on operators of private landfills in New Jersey and on cities outside the state that contracted with those operators for the disposal of their trash.  Id. at 619.  The Court reasoned that since New Jersey made no claim that the movement of waste through the state endangered its residents or that the waste at issue was in any way different from the waste generated within the state, the statute was an "obvious effort to saddle those outside the State with the entire burden of slowing the flow of refuse into New Jersey's remaining landfill sites. . . . [and was] clearly impermissible under the Commerce Clause."  Id. at 629.

Based on this precedent, DWP argues that Orr is merely trying to isolate itself from a problem that is common to many railroad towns, and that the special

20

law will inhibit the movement of interstate commerce, and thus violates the

dormant commerce clause.

"A state law that is challenged on dormant Commerce Clause grounds is

subject to a two tiered analysis." South Dakota Farm Bureau, Inc. v. Hazeltine,

340 F.3d 583, 593 (8th Cir. 2003).  "First, the court considers whether the

challenged law discriminates against interstate commerce." Id.  "If the law is not

discriminatory, the second analytical tier provides that the law will be struck

down only if the burden it imposes on interstate commerce 'is clearly excessive in

relation to its putative local benefits.'" Id. (citing Pike v. Bruce Church, Inc., 397

U.S. 137, 142 (1970)).

It is clear that the special law would have the same effect on both

Minnesota and out-of-state trains.  Moreover, the time involved in traveling

through Orr at 30 mph is not that much greater than traveling through Orr at 60

mph.  Thus, as discussed above, the special law is not an impermissible burden on

interstate commerce.  In addition, the cases cited by DWP can be distinguished

because the special law is clearly not an attempt to solve Orr's problems by

placing undue burdens on out-of-state entities.  Therefore, the burden on

interstate commerce is not excessive in relation to the benefits that flow to the

City of Orr.  Thus, the special law does not violate the Commerce Clause.

21

### 5. **Conclusion**

The special law is constitutional and valid.  DWP's motion for summary judgment is denied.

### C.     **Defendant Ross Litman's Motion for Summary Judgment**

The only allegation in the Complaint that pertains to Litman is that DWP stands to suffer harm because the St. Louis County Sheriff's Office will likely begin enforcing the special law soon.  (Compl. ¶ 20.)  The Sheriff's Office has agreed to forego enforcement of the special law unless, and until, this Court declares it valid.  In spite of several requests to do so, DWP has refused to dismiss Litman from this lawsuit.

The Court has found the special law valid.  Therefore, Litman has an obligation to enforce the special law.  See Anderson v. St. Louis Cty., No. A04-2048, 2005 WL 1389881, at *4 (Minn. Ct. App. June 14, 2005) (unpublished) (noting that in St. Louis County, sheriffs commit "malfeasance in office" by any "wrongful or willful neglect of duty") (citing In re Olson, 300 N.W. 398, 400 (Minn. 1941)).  Thus, DWP has no controversy with Litman, and Litman's motion for summary judgment is granted.

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Summary Judgment [Doc. No. 29] is **DENIED**;

22

2.  Defendant Ross Litman's Motion for Summary Judgment [Doc. No. 42] is

**GRANTED**;

3.  Minn. Special Law 2005, H.F. No. 140 Sec. 101, and City of Orr Resolution

2005-7 are **VALID AND ENFORCEABLE**; and

4.  Defendant Ross Litman is **DISMISSED** as a Party to this action.


Dated: May 31, 2007

s / Michael J. Davis
Michael J. Davis
United States District Court
